Case number 19 3850 Freddie McNeill Jr versus Margaret Bagley. Oral argument. 30 minutes per side. Mr Thompson for the appellant. Good afternoon. You may proceed, Mr Thompson. Thank you, Your Honor. I may please the court. Justin Thompson on behalf of the appellant Freddie McNeill. I would like to reserve five minutes for rebuttal. All right, a suppressed police report from the night of the murder documented that the state's star witness, Robert Roshinsky, was, quote, shown a photo array of Polaroid photos, which included Freddie McNeill. Looking at these photographs, he failed to pick out anybody, end quote. This conflicts with Roshinsky's testimony at trial, where he confidently testified that he had an established relationship with McNeill and recognized him immediately as a shooter. Although there was other evidence suppressed, I would like to focus on this component of the Brady claim because evidence undermining a star eyed witness is a classic example of a Brady violation, and McNeill can win on this evidence alone. After addressing the merits, I'll discuss the reasons why there are no procedural issues that would block this court from granting relief. In state post conviction proceedings, the prosecutor never disputed that this report was favorable or that it was suppressed. The merits of McNeill's Brady claim comes down to whether or not the suppressed evidence qualifies as material, and it clearly does for three reasons. One, the suppressed evidence undercuts the credibility of the state star witness. Two, the strongest defense McNeill could have put forward never came to light at trial. And three, the state's remaining case against McNeill was weak, with no physical evidence connecting him to the crime. As far as Mr Thompson, it's when you say that there's no physical evidence in this case. That disregards the fact that there were several eyewitnesses who identified Mr McNeill as the killer, doesn't it? Well, Roshinsky was the star witness. You're referring to the four other Children. I'm referring to the Children and to Mr Roshinsky. Well, there were four Children that testified in addition to Roshinsky, but there are two problems with the Children. So, number one, they don't identify McNeill with any confidence, and two, their testimony about the crime is incompatible with what Roshinsky testified to. All right, Mr Thompson, doesn't T. R. Identify Mr McNeill with a lot of confidence? T. R. Says he was my next door neighbor. He would sit on my mom's car all the time. He threw beer cans at me. Yes, I knew Freddy. Yeah, he was next door neighbor. I mean, that that was a very positive I. D. Wasn't it from from that eight year old? Well, to the other two the other. Let's talk about it. Talk about T. R. Who actually lived right next to your client. Well, how was that not a positive I. D. I. D. Because two of the other testified when they were questioned about the crime. Two of the other with child witnesses who followed her testimony both said that she was not even outside of the time of the murder. And when she testified, she started giving specifics about the crime. And when she asked, How did she know that? She answered with one of my friends told me she's talking. I mean, I read the testimony she's talking about. She did not see the moment of the shooting. But she said, I saw him with the gun. I saw him run after I heard the sound. I saw Freddy run and he ran right between the two houses. And that's not disputed by the other kids, is it? The fact that that's consistent that he ran after the after the shooting. But she also testified that when the car pulled up, when the victim's car pulled up, it's all right. But there's a positive I. D. By her after the shooting, right on director. She does identify him. And as soon as she's cross examined, that reveals her identity cannot be relied upon. Not only what she said, isn't that a jury issue? I mean, the state court determined that the Children were credible witnesses and allowed their testimony. And I don't think you dispute that on appeal. I'm not sure you can. But you're arguing now that, well, it's not all that reliable. But that's a jury question, is it not? It is. And we know from there, and it's clear that I mean, the reason the prosecutor relied so much on Roshinsky at trial is because it's clear that their testimony they don't identify McNeil as soon as their cross examined with any level of confidence. I disagree with you. Also, the murder occurred right in front of your client's house. Did it not? It was three houses down. Three houses down. All right. Almost. The district judge Polster says it's almost right in front of your client's house. That's physical evidence. Is it not that the murder occurred three houses down from your your client's house? Well, it happened three houses down, but the detective admitted there was no evidence connecting him to the scene, and that would have to be. Is it just coincidence that the murder happens right by his house? I mean, that's that's significant evidence. Is it not? It's evidence. I don't think it's significant. It's just a coincidence that he lives right there. And the Children say they I mean, there's a lot going on here. Well, the jury, we can't just look at that as in a vacuum, Your Honor, because we also have to consider the fact of evidence that was suppressed because that directly whatever weight that would carry with the jury would have been far outweighed by what was suppressed in this case because I want to ask you about that, a little bit more about that, too. The police report says that, um, initially, Mr McNeil was presented with some Polaroid photos, and some of us are old enough to know exactly what a Polaroid is. And then he was presented with mug shots, and the two events appear to occurred right after each other, the two different photo arrays. And upon being shown the mug shot, Mr Regency immediately identified Mr McNeil and stuck with that identification. Um, I'm not sure you get as much out of the fact that he initially failed to identify Mr McNeil. When you consider the overall context of the two arrays, I mean, certainly a skilled defense lawyer would have gotten something out of that during cross examination. But whether it's enough to have made any difference, it seems to me is a is a serious question to be asked. Well, the prosecutor's argument at trial was the strongest evidence of Roshinsky's identification of McNeil, and he argued that Roshinsky was able to identify McNeil immediately without any hesitation that he recognized him immediately as he got into the car. The evidence that the state suppressed directly contradicts that. That's why the prosecutor said he was a reliable witness because of an established relationship, and he recognized him immediately. So as in closing argument, the prosecutor prosecutor asked the jury who knew Robert Roshinsky who dealt with him in the past. But the jury in this case never knew that the state suppressed a report that told a completely different story is his claim that he recognized McNeil immediately as a result of established relationship is incompatible with him being shown a picture and saying no, that he could not identify him by name. And when he was shown a picture of McNeil the first time, he made an affirmative representation that that was not the shooter. So he did not. He did not. He said, I cannot identify any of them. He didn't say this is not the shooter. He's asked, do any of these Polaroid photographs? We don't know the quality of the photos as Judge Gibbons is saying. Uh, I, I, I'm old enough to know that Polaroid photos are often not very good images, too. And, uh, we don't know how good of a representation that Polaroid photo was of your client. And all we know is that based upon those Polaroid photos, he didn't, he didn't pick out anybody. But, but immediately thereafter, he's shown mug shot photos, which usually are good quality, and he picks them out right away. So I, I really like Judge Gibbons is saying, I don't see how this gets you very far as to establishing a reasonable probability that if you were that they would get you much that you change the verdict. Well, this is a case as far as, um, I mean, the prosecutor repeatedly told the jury that Roshinsky was a reliable witness because he recognized him immediately as the questions about the Polaroid photos, whether they were, you know, whether the jury how clear they were not. That's certainly a question that the jury should have been presented with a trial. Now, the Supreme Court's made clear that it's not for, in hindsight, after the Brady evidence comes to light, it's not for us to sit here and debate the reasons why a jury may have disregarded that because another juror just as may well have credited. That's especially true in a case like this, where the state's case relied primarily on one single witness. So I think, I think, I think it's incorrect to say it relied on a single witness. It's really unusual to have several individuals who have witnessed a murder, even if some of them are Children. Uh, that's just an unusual fact pattern, uh, that makes this case, um, really unusually strong in many ways. Well, your honor, the prosecutor's opening statement in this case is essentially a preview of nothing else. And the reason for that and same thing in closing, he refers to Roshinsky and very little else. And the reason why is because when you peel back and look at what the Children testified to, they don't do what the state says. There are significant reasons to doubt their testimony. For example, you know, Brittany was one of the test. One of the Children who testified on cross examination, she said, I didn't see that much of the shooting because I went into the house question, take a good look and just think about it for a minute. And if you're not sure, I want you to say that. Take a good look at him. Are you sure? Or are you not sure answer? I don't know. You're not sure that is that what you're saying? Yes. So in Brittany's situation, it's not even fair to call that unreliable. That's just not an identification period. Ronald, the six year old, he was shown a photograph of McNeil a week before trial, did not recognize anybody. And as I mentioned, tear Jen provided many specifics. Um, but she also admitted one when she was pressed for details, she said, one of my friends told me, and it's important the context also what tear Jen said, because the majority, she gave a lot of specifics, but they're completely inconsistent with the state's theory of guilt. For example, tear Jen, the first child, she said she was talking to McNeil in the driveway when the car pulled up. I mean, that's completely incompatible with the state's theory of guilt. You know, Freddie McNeil could not have been in the driveway talking to her when Roshinsky says he's in the backseat of the car. So what she testified to is it's completely incompatible with the state's theory of guilt. Um, Ronald, as I mentioned that Ronald was shown a photograph of McNeil. He did not identify him. He admitted that in Christopher, the final witness when he was pressed on specifics, he admitted it was because, quote, tear Jen told me. So there are significant problems with all four of these Children, not only in their ability to identify McNeil, but also they tell a version of the crime that's completely incompatible with what Roshinsky said. And that's exactly why the prosecutor relied so heavily on Roshinsky. Both the prosecutor and defense at this trial, they recognized that he was the centerpiece of the state's case. In opening statement and closing argument, they repeatedly addressed Roshinsky, and the prosecutor told the jury. Obviously, a large part of the state's case is Robert Roshinsky, and you're going to have to think very carefully about what he said and whether you can depend on that. So it's by the prosecutor's own words. He's their key witness. He didn't tell the jury to rely on the Children. He told them to rely on Russian, and the Supreme Court has been consistent in cases like this, that prejudice is magnified when this pressed evidence undercuts the centerpiece of the state's case. Cowles v. Whitley and Smith v. Tain both involved the suppression of police reports that documented the evolving stories told by a key eyewitness between the time when they met with the police and testified at trial. And that's exactly what we have here, because Roshinsky was shown a photo of McNeil. He did not recognize him, and he stated no when asked if the photo of McNeil was the shooter. As far as like underscoring how important he is to the case, after McNeil's convicted, the trial court post conviction, direct appeal and even the warden's brief focused almost exclusively on Roshinsky. In our brief, we spent several pages addressing all of the Children, all the reasons why the Children should not be trusted. The warden's brief gave no explanation, did not respond to any of our arguments as to why the Children are reliable. And the reason is because when you take a close look and dissect with the Children say it actually helps McNeil. And that takes us back to why Roshinsky is so important. As far as, um, some of you, Your Honor, have asked about how this would have helped the defense. I mean, this is without question the strongest defense McNeil could have presented at trial because the prosecutor argued that Roshinsky's identification McNeil was compelling evidence of guilt. And in their words, as McNeil got into the car, he already knew who he was, and the prosecutor repeatedly focused on the fact that he could identify him completely different story. Even the warden's brief acknowledges that they did not any, as far as impeachment evidence, that Roshinsky was never impeached on the fact that he was never questioned about the photo lineup or the in court identification. So Roshinsky never had to reconcile his claim that he recognized McNeil immediately with the fact that he could not identify him when first shown a photo. And it's also important to note that in addition to impeaching Roshinsky with this, it's also powerful exculpatory evidence. McNeil could have introduced this. He could have introduced evidence about Roshinsky's inability to identify McNeil as exculpatory evidence as part of his own defense because there were two officers that night who took part in the photo array with Roshinsky the night of the murder. The defense counsel could have called them and questioned them about Roshinsky's inability to identify McNeil. And why? Why? Why could he not? Why did he not? Why could he not? They listened to the tape before the cross-examination of Roshinsky. And the tape clearly shows that that Roshinsky was given those, those photographs first, and he did not identify anybody. And I mean, the natural assumption is that they, they, they know your client McNeil is the suspect. And they're not giving photos of just anybody on the street. They usually include the suspect. That's the, that's the whole idea of identification. And defense counsel knows at that point, that the initial photo array, he didn't identify anybody from from the recording. So defense counsel has this information. And it's not in black and white, like the like the police report that says, yeah, these photographs, one of them included the suspect, McNeil. But other than that, defense counsel knows everything. And the reasonable assumption is yes, one of them would be McNeil. Why else are they showing the no, and what it would have done differently had he actually had the police report? It seems like any, any, any competent counsel would just infer that yeah, he didn't identify these initial photos. And I bet one of them was McNeil. Well, I have two responses to that. Number one, defense counsel was repeatedly told they were misled by the prosecutor, that Roshinsky identified them immediately. So they can't be followed. No, he listened to the tape, he could see, you could hear on the tape that he did not identify immediately because he's shown photographs. And he says no, no, no to all of them. And then there is a there's a pause. And you can, you can, you can hear it in the tape that the other they're going to get some other photos. I mean, it's it's clearly shown photos and nope, McNeil was not at that point and still doesn't cross examine. They don't know that the problem with that your honor is there's a Roshinsky's inability to identify McNeil. It's not documented anywhere in the recorded interview. There's a glaring omission. McNeil is the suspect. I mean, what, what photos do you think they were showing him if it doesn't include the suspect? Well, based off the prosecutor's representations, not McNeil, they told the jury, they told the jury, they have any other suspect at the time. I don't think so. They did. That was another report that they suppressed that there wasn't returning the suspect. Well, I know he was dismissed promptly though. He was, he was dismissed, I think that evening. Uh, Patterson, the guy with the abandoned car, he was dismissed right away. And I don't, I don't think that he's, he's  uh, the only time the state ever, the only, I want to come back to the report regarding in one second. But as far as the alternative suspect, there's no question that an alternative suspect is favorable evidence. They thought this was serious enough to take him into custody and document in a report. His name is Patterson and he, his mother owned the abandoned car. He's found in the vicinity of the abandoned car. They look into him as an alternative suspect and they quickly dismiss him and say, no, he has nothing to do with it. And I don't even see you arguing seriously that he is the guy that committed the murder. I mean, are you, are you arguing that today? Well, he's the murderer. Patterson is a murderer. We don't know that. All we have to do is undermine confidence in the verdict. So I don't know. I mean, that's the standard we have to meet. There was evidence that they took into custody and this is information. There's no question that defense counsel should have had this under brady. This is information. It's hard for me to see how that could possibly have been advantageous to Mr McNeil to know about that. That's it's not a suspect that could, I mean it's clearly somebody who was not a suspect in any meaningful way other than at a for a brief period of time generally was seen as possibly meeting the description when he was in the car. But I mean the whole thing unraveled with him as a suspect promptly to argue that that is of any legitimate benefit to Mr McNeil seems to me a real stretch. Well, I think if they had this before trial, your honor, this is something they could have developed. So, um, but I do as far as the suppressed evidence, I would agree that it's certainly not as powerful or not as strong as the, as the suppressed report regarding machinsky and judge Griffin. I want to come back to your question real quick. As far as the report that or the interview that was played, you know, the problem with relying on the recording is that there is a glaring omission in the audio. Now the tape records since he's stating no. After being shown a series of photos, the audio alone gives no indication of what he's looking at. And that's the context of that defense counsel. You certainly could cross examine him at that point. Defense counsel, the testimony has been stopped so that they can cross examine racinski. Defense counsel has heard the tape and has learned that yes, he's shown initial array of photos. He doesn't identify anybody and the opportunity is there to cross examine and maybe by not doing its ineffective assistance of counsel. And I understand that you had a previous claim for that, but it's not before us now. But I just, I just see defense counsel on notice of this. Um, and I mean, I'm on notice of it by just listening to the tape. You're running the, I mean, the easiest way to look at this is the report is doc is E. C. F. 1 16 3 page I. D. 24 70 24 79. That clearly documents that racinski is shown a photograph of McNeil and he did not identify it. Sure. Racinski's interview is at 1 30 E. C. F. 1 33-2 at no point in that time. Is it clear at all from the record that that that that information is contained in the recording? It's just a reasonable inference that one of those photos would would be of McNeil. That's all. And that's that's the only logical inference I think I can get from it. But I understand your position. It is not in black and white. It's not set forth and therefore somehow you might have missed it and therefore you defense counsel, reasonable defense counsel would not cross examine the fact that you did not identify or you're showing an array of photos and you didn't do anything with them until the second array. But okay, I understand your argument and you're on. You asked the question about ineffective, ineffective assistance of counsel. The problem with that is defense counsel cannot be There were two times before trial where they filed motions seeking exculpatory evidence. The first time the state never responded. The second time they filed a motion and said that no favorable favorable evidence exists after Racinski. Racinski took the stand and testified that he recognized McNeil immediately. This report was in the prosecutor's possession. They did not correct his testimony. And after he testified, they never alerted defense counsel. The fact that his prior inconsistent statements in post or even then said they gave them the entire the entire file. And we know that's not true. So the only reason defense counsel was able to obtain this information was because of a fluke when the victim's family filed a civil suit and the state included this in their response. And the state's response is important after McNeil filed this in post conviction because they never argued the line of your questions. The state never argued that defense counsel was on notice for this. Their response was this information was in our exclusive control and we did not have to turn it over. So defense counsel could have requested this 100 times before trial and the prosecutor's response made clear they were not going to turn this over. So defense counsel cannot be faulted for being misled before your time's up. I've got a question about epi deference. Yes. And uh the question I have is whether the post conviction state court rulings are entitled to epi deference that the Ohio Court of Appeals in 2000 addressed the Brady claims. And this is a page 28 of the opinion from Northeast Reporter. And it says in claims two and three and those are the Brady claims. McNeil alleged improper conduct by the state but none of his evidence even suggested that the state did anything improper period. Moreover we failed, he failed to demonstrate that he could not have raised this issue at trial or on appeal. Now the second sentence more over is a procedural default ruling that the Ohio Court of Appeals says that it's it's defaulted procedurally. However the first sentence to me appears to be a merits determination on claims two and three of Brady that none of this evidence suggests that the state did anything improper. And it's basically just a conclusion. It's a denial of the Brady claim. A lot like if we were just Brady is raised, it's hereby denied. But assuming that is a state trial courts ruling on that Brady claim as to the merits. And there if we look at the trial court, state trial court ruling on the merits at page three of the opinion, finally defendant alleges that he meets these documents. He needs these documents because they're exploratory, exploratory evidence to him. However, the court has determined that none of this evidence is exploratory. I mean, the trial court appears to have rejected the Brady claim on the merits too. And don't we pass, don't we look through to that trial court ruling and give that at the deference. And this is in regard to the post conviction rulings. Well, I would start and point out, I agree. It's a decision on the merits. Um, in the word, the Ohio Court of Appeals decision is on the merits. Yes. Okay. Um, and even when this was filed, I see my time is up. Can I continue? I hope so. Yes. Um, Judge Clay, is it all right if he answers it? Uh, go ahead. I agree. It's a re agree. I think that this is a decision on the merits. The warden in their return of writ, um, after McNeil filed his habeas petition, which is at E. C. F. 40 page I. D. 1 59. They agreed, quote, this claim was, quote, properly raised and preserved for federal review. So not one time in the district court did the warden ever alleged that the original Brady claim was defaulted for not raising it properly. So that was a decision on the merits. Um, as far as, um, deference applying, I don't think there's any problem, um, overcoming any deference to the state court decision in this case. Okay. Do you agree that we're that the Brady claim is entitled to effort deference? Yes, but he has no problem overcoming that deference because, okay, thank you. That's that's all I need. I have no further questions. Um, Council, before you go, do you need to decide to say anything else about any of these other, um, problems with recency's testimonies, such as misidentifying the color of the hat or, um, getting wrong the description of the suspect's jacket? Uh, uh, those kind of, um, matters. So do you just want to rely on your brief for your brief for those things? Well, I think that's important because it illustrates all that information. It illustrates how even before we get to the Brady evidence, how weak the state's cases, you know, this is not a case. You know, typically there are cases with hallmarks of compelling evidence of guilt. There are some level of forensics or a cooperating codefendant or information like that. There's nothing here. As far as that, they have four Children who don't identify McNeil with any confidence. The state's case rests on Brzezinski, who has already had significant credibility issues and is high on crack at the time of the offense. And I think an important response to this as well, Your Honor, is the 28 J letter we filed on April 27th in Miller versus Genevieve's. Some of this evidence did come out, so there's no question he was cross examined, and there's no question he was already an unreliable witness. But this court still granted relief on the prejudice issue when defense counsel were blocked from questioning him on evidence that went to the heart of his testimony. And here that was his ability to identify him immediately, which this press report documents. So I think the fact that you know that evidence you cited to, it's just more evidence of how weak the state's case, how weak the state's case is even before we get to this pressed evidence. All right. Um, there were, um, there were issues or argumentation in the briefs about such issues as, uh, race, educator and procedural default. Uh, do you Is there anything more we need to know about about that? Are you want to simply rely on your briefs for that? Well, I would point out that McNeil raised his original Brady claim in the 1996 petition, and after exhausting the state, the warden agreed this was properly raised and preserved for federal review. So not one time did they ever raised it argued that this was not the original Brady claim was preserved. So where the district court aired, I know the district court ultimately held this claims defaulted where the district court aired is when it concluded that the new trial, the 2011 new trial motion defaulted the originally preserved claim. And that's just, you know, tone versus Bell Supreme Court precedent explains that a claim is procedurally barred when it has not been presented to state courts for their initial consideration, not when the claim has been presented more than once. So there's no question this clearly preserve the original claim. And the reason that why that's important is because the 2011 evidence just confirms what we already know. They never can state court. They never contested that this evidence was suppressed. Um, it's clearly favorable. So and even the district court recognized when we move to amend in E. C. F. 1 28 when the district court granted Neil's motion to amend H. I. D. 6 10 E. C. F. 1 28. Even the district court recognized that the new evidence does not introduce a new claim. It amplifies a claim alleged in the original petition. And in that claim, this not one time has the warden ever argued that it was not properly presented in state court. So it clearly could not have been raised you to Cotta because he relied on evidence that the warden or the state prosecutor agreed they suppressed. So obviously this could have been raised anywhere else but post conviction. Mhm. All right. Uh, Judge Gibbons, do you have any further questions before we? Uh, no, not at all. All right. Okay. Well, uh, thank you, Mr Thompson. You have your five minutes for a bottle and we'll hear from, uh what's that? Okay, well, we'll hear from, uh, the Apple East, uh, council at this point. Uh, Miss, uh, Kayla, is that the way you pronounce that? Your honor, you're close. It's, uh, legal up. May it please the court. My name is Brenda legal and I represent the warden in this case. Um, you are. I'm sorry. Go ahead. You may proceed. Okay. Um, your honors. Uh, I will start with the question that you ended with Mr Thompson, the procedural default and and race judicata. Um, the initial Brady claim that was presented in 2000 is absolutely a merits decision afforded at the deference and therefore the court cannot and should not consider any additional evidence. If Mr Thompson's position is that the new evidence they acquired with federal discovery, uh, does not change the claim and is not a new claim. They should quite honestly have never been granted a rind stay to go back to state court to, um, quote unquote exhaust the claim because that was the whole basis of the stay was to go back and exhaust the Brady claim. If he's now conceding that the claim was exhausted, then pinholster bars any additional evidence, which means it bars this court from reviewing the tapes. And quite honestly, as the warden repeatedly argued, it was improper for the district court to expand the record to include those tapes because there was a merits determination on the original Brady claim. Um, in fact, the district court said that because he tried for all these years to get these tapes and he only got him in 2008 when he found him in federal discovery, we're going to ignore 22 54 E two and and consider them anyway. So if Mr Thompson is now conceding that the claim was already exhausted, the rind stay should have never been granted. And this case should have been to this court a long time ago. Um, you know, as to the strength of this case, you know, Judge Gibbons and Judge Griffin, you both have have said this is, um, a really strong case. There are not very often that you have a murder with so many witnesses. No, And as the testimony showed, they had different stories, different, you know, different versions. But they've done psychological stories or psychological tests where, you know, a crime happens in a classroom of college students, and every one of 50 college students has a different color or, you know, they grabbed a purse versus a bag. I mean, so the fact that for, you know, kids under the age of 10 have different, slightly different versions does not. And clearly, the jury did not find that that was a significant impediment to their identification. Council, how do you compare our case with the Supreme Court's holding and um, and, um, two of them were, um, were impeached. And the Supreme Court found them found that there was some problem. Um, just based upon even though there was still, um, I suppose, at least two witnesses whose testimony was was still, uh, uh, not called into question. Um, well, what do we take from the Supreme Court's case in Cal in relation to this case? Well, Your Honor, in relation to this case, we don't have a violation because as Judge Griffin, you know, pointed out, it's clear on the audio tape that he's shown, uh, a photo lineup. It's reasonable that, uh, you know, McNeil being the suspect would be in that lineup. And the briefing in the court below is absolutely incredulous that, you know, to suggest that the prosecutor would have played, you know, the, uh, Rosinski's identification, you know, personal identifying, you know, information, name, social security number, where he lives, but then, you know, but skip, you know, the things that happened immediately after and, and yet keep all the other inconsistencies. The reason we don't have, I'm sorry. I was gonna say, it seems to me that the answer to Judge Clay's question, if I understood it correctly, is a comparison of the facts of the two cases. Is that not wrong? I'm sorry. Maybe I misunderstood the question. Well, I don't know. Maybe I misunderstood it, but Judge Clay can speak for himself. But yeah, I mean, it's a matter of the suppression of the impeaching material or the failure to divulge and what the impact of that would be in terms of the we're supposed to be considering here's, which of course is not not guilty innocence, but whether the evidence or the obstruction of evidence might have undermined confidence in the verdict. Go ahead. If I understand your question, it's in that case, there was suppression. And my, my response is, in this case, there is no suppression of the of the evidence because it was played during trial in camera. And Brady applies to evidence that is completely never disclosed. And in that not a delayed disclosure, whereas in this, if anything, it was a delayed disclosure, but it was disclosed during trial. And defense counsel could have acted upon it could have done cross examination based upon the audio tape. And the police report is not a statement, it is not ever attested to by Wisniewski. It is simply the police documenting what is in the recording. And again, the recording is the best evidence and he, he being the defense attorney listened to it could have asked, Hey, what am I, you know, what is this? No, no, no, or could have asked Wisniewski, what, you know, you were clearly shown something, what were you shown, could have asked for the officers to come in. Clearly, one of the officers was in that in camera hearing because the prosecutor says, you know, at one point, I think that's it. But let me ask Ricky and Ricky, you know, there's a side conversation. And then the tape is played. The transcript says is played again in its entirety. So clearly, there's an officer there. He, he being McNeil's counsel could have called that officer to the stand to explain what they listened to, could have asked Wisniewski what, you know, transpired, and clearly did cross examine based on other information in that audio recording. So the, the difference between the two cases is there was no suppression in this case. It was there. If he chose to use it. Counsel, I think there was suppression. I think that under Brady, both these police reports should have been disclosed. You know, my question is whether they're material and whether it's prejudicial, the fact that they were not, but I think under Brady, well, I mean, your argument that they're not that they should not have, they did not have to be disclosed under Brady. I tend to disagree with you on that point. And I don't think that's your strongest defense. Be that as it may, I, I'm, I'm kind of inclined to agree with you as the materiality and the prejudice aspect of it. And that was going to be my next point. Even if these were suppressed, they're not material. The, the wealth of the evidence, even without, you know, impeaching, they, they certainly tried to impeach Wisniewski on, on other, you know, inconsistencies. And you have other testimony, not just of the four and, you know, positively identifies him. But you also have Sanford, who is McNeil's girlfriend or ex-girlfriend, depending on, you know, when her, her statement is saying that he, you know, brandished a gun to her because he wanted 30 bucks the same day. And then what, what, what relevance is that? I mean, I, I know that's in the record, but I'm not even sure why that came in. I mean, it sounds almost like other, other act evidence, and I'm not sure what, what, what's the relevance to this? Your Honor, it came in because the gun was never found. And to show that he was in possession of a gun, similar description to the description she gave of the gun was consistent with the description of the children's. All right. All right. I understand. Make of the fact that the state courts used the wrong legal standard. And running on the Brady issues because the state court said that certain of the material didn't have to be turned over because it was not in narrative form. And therefore, the Brady violation was not a violation because the material was not set forth in, in a narrative format. And of course, that's, that's not the standard for, for Brady. So there were, there were sort of evidentiary mistakes, or mistaken statements of the legal standard of the state courts with regard to some of this Brady material. What, what are we to make of that? Your Honor, I believe that you can completely, you know, not necessarily ignore, but that doesn't matter in this case, because it, the the suppression prong wrong, it's still ultimately, there's no prejudice in that it wasn't turned over. And the analysis is correct under the state's criminal procedure rules. So whether the criminal procedure rules insulate the prosecutor from, you know, Brady, it, you know, is definitely a different, a different question, but You're not saying that the police reports were not material, are you? I'm sorry? You're not, you're not saying that the police reports were not material, are you? I am, Your Honor. And why is that? I mean, if you, if you don't think the withholding of the reports was prejudicial, if that's your argument, that's one thing. But for you to say that the reports were not, were not even material, well, what would be, what would be the basis for that? Your Honor, we're not material. Under Brady, materiality and prejudice are the same prong. So they're not material because they wouldn't have necessarily changed the outcome of the trial had defense counsel had them. So that is why they're not material. That's not the legal criterion for Brady, is whether withholding the material undermines confidence in the outcome. It's not, the legal standard is not what you just stated. But these documents would not have undermined the confidence in the trial because of the overwhelming other evidence that is presented in the trial. The fact that the murder occurred a few doors down from McNeil's residence, the children identified, his girlfriend identified a gun that is similar to the gun that both Raczynski and the children identified. So there's, you know, ample other evidence. And under Brady, if there's other evidence that would make the suppressed evidence not prejudicial, not material, then you do not have an undermining of the confidence in the verdict. On another, on a related point, you mentioned the state procedural rules. Well, every, you know, state has probably some rules that govern discovery in If the prosecutor considers his duty to be only to comply with those rules, there's a very real risk that Brady material will not be produced because the prosecutor has an obligation to determine whether there are things within its control, and that means within the control of law enforcement too, usually, whether they're things that are exculpatory. So if you, if you do, if you are going to avoid problems down the line, then you can't just comply with the discovery rules. You've got to scrutinize what you've got to determine if it's exculpatory. Isn't that right? Yes, Your Honor, that's absolutely correct. And that was one of the reasons that Ohio has subsequently changed criminal rule 16 for open file discovery. Back when McNeil was tried, that was not an open file discovery regulation for prosecutors. Now, when I was a prosecutor, I had open file discovery as a personal policy, but that was over and above what criminal rule 16 required, which has since been changed. So now, under today's law, that would have, or under today's law, been handed over or should have been handed over immediately anyway. So you're absolutely correct. Well, and it's risky if the prosecutor doesn't want to readily concede that a piece of, that a document or whatever it is, is exculpatory in nature because the prosecutor takes upon himself or herself the judgment of whether it's ultimately going to be material. It's a risky way to proceed, isn't it? Yes, Your Honor, which is why my personal policy when I was a criminal prosecutor was to turn over anything. When in doubt, give it out, was my personal philosophy on evidence. Would that have been the better course? Absolutely. Does it make any difference in this case? No, it does not. Doesn't make any difference because the evidence, even if it was in the possession of defense counsel, would not have undermined the confidence in this verdict. Judge Clay, did you have a question? It looked like you were about to ask something. No, I was on the edge of my seat waiting for the next thing you might say. OK, I'm sorry. I thought you were going to, doing this by Zoom, it's very hard sometimes to tell when you're going to ask a question. I understand. I understand perfectly. But the, you know, I believe, especially with the identification and the photo lineup, you know, it's pretty clear that when you listen to the recording or when you read the transcript of the recording, you know, that there's a photo lineup shown and it is absolutely, as Judge Griffin pointed out, reasonable that McNeil's photo is in there and defense counsel could have and should have asked questions about it. And, you know, he he chose not to do so. You know, the. The prosecutors, you know, focusing on Raczynski as the key witness, you know, one of the that one of the reasons is he's in the passenger seat while Fulton is being murdered. So he's right there. You know, that's one of the reasons he's, you know, the you know, as Mr. Thompson says, the star witness. I mean, he's even closer than the kids are. So, of course, his testimony would would be, you know, highlighted. And Mr. Thompson says, you know, at no time has the kids testimony, you know, the state or the kids have to say, well, you know, the reason that we focused on Raczynski's testimony is because that's what they're you know, the Brady claim is about is his testimony. It's not about the kids testimony. The kids testimony is why the alleged suppression is not material. And, you know, I think, you know, I've laid out why it's not material. If, you know, in the warden's eyes, if there's any questions on that, I'll certainly answer them. But as to any new claim that based on these recordings that he got in federal discovery, if this is classified as a new claim, then that is procedurally defaulted based under Ohio Criminal Rule 33. And the fact that they didn't meet the timing, the reasonable time requirements. If they are going to change course and say that the claim was fully developed back in 2000 and is fully exhausted at that point, then this court and the court below should not have considered it under pinholster, because if a claim is determined is determined on the merits, then the federal court cannot view additional evidence and that these tapes would absolutely be additional evidence. And these police reports that that, you know, we're talking about were obtained in the original post conviction and the state courts did a merits determination on those reports and found that, you know, none of them rose to the Brady materiality prong. You'll give me just a moment. Unless the court has any further questions for me, I have nothing additional for the court denial of habeas relief should be affirmed. I have no further questions. Me either. Okay. There's Mr Thompson you have five minutes for for rebuttal. I think your mute button is on I can't hear you. I apologize. Okay, now, yes, now I can't. Just claim just Griffin's you know you both asked, you know, several questions in terms of materiality and just clear you're correct he does not have to prove innocence. All McNeil has to do is undermine confidence in the verdict. And we addressed several times in our brief cases where this court has granted relief on a Brady violation in turn in Jameson versus Collins relief was granted on a Brady violation. There was evidence in that case of a cooperating codependent forensic evidence and a history of robberies consistent with the murder relief was still granted and vice versus Sheldon relief was still granted, even though there was a confession from the defendant. And in Hill versus Mitchell, he lost on a statute of limitations issue, but a majority of this court agreed the suppressed evidence was favorable, even though one day before the victim's death, he had made threatening remarks to the victim. Now, there's nothing nearly as compelling as evidence of guilt in this case. Um, as far as the children. Yeah, as I mentioned before, the counsel for the warden does not give this court any reason as to why they should be trusted when we went into specific details of all the problems with their testimony and that's exactly why the prosecutor repeatedly focused on Roshinsky. And as far as, you know, counsel for the warden acknowledged that Roshinsky was right there. Isn't it possible that the reason the prosecutor focused on Roshinsky was that Roshinsky could provide the whole context and the factual background for what preceded the murder, the children weren't there. And that helps with, you know, establishing the motive, establishing the circumstances of how these people happen to be together, and so on and so forth. Wouldn't that be a valid prosecutorial reason for focusing on Roshinsky as well. I would agree, but that also the flip side of that argument is it shows why the suppressed evidence is material because they repeatedly relied on Roshinsky and very little else. So, that shows why this evidence is material and I mentioned Jamison versus Collins, you know, the facts of that case as far as the identification parallel this case in many ways, because in that case, there was an initial failure to identify, followed by an identification. I thought that a big reason for the focus on Roshinsky was that Mr. Roshinsky claimed that he was well acquainted with Mr. Magnillo. In other words, he was familiar with him from prior interactions, such that he very well knew what the man looked like and so if he failed to identify him, even if it wasn't the best, the clearest picture, that would be of some import if he's looking at a picture of somebody he claimed to be well acquainted with, was that a factor? Absolutely, and if what Roshinsky said was true, it shouldn't even come to that. He should have been able to say, this was Freddie McNeil, I've dealt with him before and I know him. He didn't even say that, he did not identify him in the photo. So, all McNeil's asking for here, you know, the bottom line is, he's just asking for that there's no question Roshinsky's the star witness. All he's asking for is that the jury be told accurate and complete information about the star witness of this case and there's no question that did not happen. The jury was misled about the credibility of the star witness and the remaining evidence of guilt, when you look at the unreliability of the children, and Your Honor, Judge Griffin, you mentioned the murder three houses down. I'm not saying that doesn't carry any weight. I'm saying it would have been, there would have been a debate that never happened in this case because I think the fact that a murder happens three doors down would have been far outweighed that in counsel for the warden said right there, the person sitting right there was shown a photograph of McNeil and said he could not identify him as the shooter. So, this is a debate, there's no question it never happened at trial. Given this court's previous decisions with far more evidence of guilt, this obviously satisfies materiality. Counsel, let me ask you this and I don't know the answer. I thought about this earlier, I would have looked it up in advance of argument today, but did the, at the trial, did the trial judge give any instructions to the jury regarding the, how to evaluate away the testimony of the children, what, how they were to treat the children's testimony and how they were to determine how much weight or consideration to give to that, to that testimony? Your Honor, I do not have a good answer for you on that. I can submit a letter to the court if you prefer, but I don't have a fresh answer off the top of my head on that. All right. Mr. Thompson, the children are now in their 30s. Have any of them recanted their testimony? There's nothing in the record as far as that, no. Um, and I know my time is up. If there's one issue I can just respond to very briefly procedurally with the court's permission. All right, go ahead. You know, counsel, counsel for the warden argued that no other evidence from 2011, as far as Wyshynski's interview could be considered. And, you know, our argument is that the state court decision, whether it be the trial court, whether it be the court of appeals, that that constitutes based off the state court record, that constitutes an unreasonable application of clearly established federal law, because they said that this Ohio criminal rule of 16 excused the prosecutor from turning that over. That's clearly an unreasonable application of federal law. So once this court determines that the state court of appeals decision was contrary to an unreasonable application or constituted unreasonable application of federal law, then you can consider the evidence developed in the district court. All right, well, thank you both for your arguments and the cases submitted.